UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ROBERT MANUEL VEGA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:13CV387 HEA |
| | ) |
| ASCENSION HEALTH and SEDGWICK CLAIMS MANAGEMENT SERVICES, INC., | ) ) ) |
| | ) |
| Defendants, | ) |

## **OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff's Motion for Summary Judgment, [Doc. No. 54], and Defendants' Motion for Summary Judgment, [Doc. No.57]. The matter is fully briefed. For the reasons set forth below, Defendant's Motion is granted, and Plaintiff's Motion is denied.

### Introduction

Plaintiff seeks to recover benefits pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA) , under the long term disability plan of his employer. Defendant Ascension Health's Claims Administrator, Defendant Sedgwick Claims Management Services, Inc. denied Plaintiff's application for long-term disability benefits. Plaintiff appealed the decision. The Claims Administrator's decision was affirmed. Plaintiff now seeks

review of the denial.

## Findings of Fact[1]

Ascension Health sponsors the self-funded Long-Term Disability Plan ("LTD Plan") for the benefit of eligible employees of Carondelet Health Network in Tucson, Arizona. The LTD Plan is an employee welfare benefit plan governed by the Employee Retirement Income Security Act. Ascension Health is the LTD Plan Administrator and LTD Plan Sponsor. The LTD Plan provides that the administrator "shall have the discretionary authority to decide all questions arising in connection with the administration, interpretation and application of the Plan." The LTD Plan gives Ascension Health the power to delegate its authority to other administrators. In accordance with the terms of the LTD Plan, Ascension Health has delegated the discretionary authority with regard to claims administration to Sedgwick, the Claims Administrator. In this regard, the LTD Plan provides:

> *Discretionary Authority*
>
> In carrying out their respective responsibilities under the Plan, the Plan administrator and the claims administrator shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in

---

[1] Defendant has filed a Statement of Uncontroverted Facts. Plaintiff, in contravention of this Court's Local Rule 7-4.01(E), failed to specifically controvert any of Defendant's facts. Likewise, Plaintiff failed to present his own Statement of Uncontroverted Facts. Consequently, Defendant's Statement of Uncontroverted Facts is taken as admitted by Plaintiff.

accordance with the terms of the Plan.

The LTD Plan defines "Disability/Disabled" in relevant part as follows:

***Disability/Disabled*** You are considered to be Disabled or to have a Disability if due to an Injury or Sickness that is supported by objective medical evidence, you require and are receiving the regular care and attendance of a Licensed Physician and you are following the course of treatment recommended by the Licensed Physician. In addition, one of the following is true:

! You are unable to perform during the first 24 months of benefit payments, or eligibility for benefit payments, each of the Material Duties of your Regular Occupation, and after the first 24 months of benefit payments, any work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings …

The term "Material Duties" is defined in the LTD Plan as follows:

***Material Duties*** The essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted.

The term "Regular Occupation" is defined in the LTD Plan as follows:

***Regular Occupation*** The activities that you regularly performed when your Disability began. In addition to the specific position or job you hold with your Employer, it also includes other positions and jobs for which you have training and/or education to perform in your profession at your Employer or any other employer.

The LTD Plan also provides that it is the participant that has the obligation to submit ongoing Proof of Disability. Therefore, during the first 24 months of

receipt of LTD benefit payments, a LTD Plan participant must be unable to perform the activities that he regularly performed when his Disability began, with either his own employer or any other employer, whether in the same job capacity or another for which the Participant has training and/or education.

Plaintiff was 62 years old at the time of filing of his action. Plaintiff was employed as a Stationary Engineer at Carondelet St. Mary's Hospital, which is a part of Carondelet Health Network. In this capacity, Plaintiff was responsible for operating all equipment and systems central to the distribution of heating, cooling, steam, water, oxygen and emergency electricity to the main hospital and other hospital-owned buildings. The physical demands for Plaintiff's position included: continuously (67%-100% of the time) - balancing on even indoor surfaces; handling tools; feeling; functional speech; functional hearing; functional vision; and cognition; frequently (66% - 34% of the time) - standing; walking; reaching; lifting less than 10 pounds; and carrying less than 10 pounds while walking through the facility; occasionally (1% - 33% of the time) - sitting; lifting 10-50 pounds; carrying 10-50 pounds for up to 50 feet; pushing; pulling; climbing step ladders; stooping/bending; kneeling; and crouching; rarely - crawling; never – reclining; and tasting/smelling.

Plaintiff's last day of work was December 10, 2009, making his first day

absent December 11, 2009. Plaintiff's Basic Monthly Earnings on his last day of work were $2849.58.

Plaintiff filed a claim for LTD benefits on or about March 1, 2010, claiming that he became Disabled on or about December 10, 2009 due to right knee pain. On December 10, 2009, Sedgwick acknowledged Plaintiff's claim for LTD benefits.

On March 5, 2010, Sedgwick requested medical records from Dr. Mark Senese, the orthopaedic surgeon that Plaintiff identified as his treating physician in connection with his LTD Application. On March 8, 2010, Sedgwick received an Attending Physician Statement ("APS") from Dr. Senese, stating that Plaintiff's primary diagnosis was a right knee medial meniscus tear and secondary diagnosis was joint effusion. The APS reflected that the objective evidence supporting disability included an arthroscopy on December 23, 2009 and an intra-articular cortisone injection on the right knee. Dr. Senese opined that Plaintiff did not "remain/continue to be totally disabled from his occupation as a Stationary Engineer." Rather, Plaintiff was able to perform work sitting 8 hours per day, standing 20 minutes per hour and walking 20 minutes per hour. He was also able to perform overhead reaching, gross handling, and fine fingering 8 hours per day. He could lift, carry, push and pull 10 pounds and could perform sustained work for 8 hours per day.

In spite of this proposed modified work schedule, Plaintiff did not return to light duty work.

Along with the March 8, 2010 APS, Dr. Senese also submitted progress notes from Plaintiff's six visits to Dr. Senese from December 16, 2009 to February 24, 2010. In the December 16, 2009 notes, Dr. Senese observed a right knee with mild effusion, mild crepitation, and mild joint line tenderness with no instability, good strength, and neurovascularly intact. Dr. Senese recommended right knee arthroscopy for a partial meniscectomy.

In the subsequent notes, after the arthroscopic surgery, Dr. Senese observed mild medial joint line tenderness with no swelling or effusion and attributed his continued pain to osteoarthritis. Dr. Senese further administered an intra-articular cortisone injection in Plaintiff's right knee and opined that Plaintiff could return to full work status if his symptoms improved after the injection.

In the February 24, 2010 notes, Dr. Senese observed Plaintiff's right knee with minimal effusion, minimal swelling and motion without crepitation, but noted that Plaintiff complained of continued discomfort despite the arthroscopy and cortisone injection. Dr. Sense opined that Plaintiff could return to light duty work with no more than 20 minutes of standing or walking per hour in an 8 hour day. Plaintiff did not return to work.

Dr. Senese submitted more progress notes from a March 24, 2010 visit

observing tenderness to palpation along the medial femoral condyle, but no significant effusion, minimal crepitation, and minimal medial joint line tenderness. He once again recommended light duty work, with a limitation on standing and walking to 20 minutes each hour. Plaintiff did not return to work.

Sedgwick also requested medical records from Plaintiff's primary care physician, Dr. Grinder Singh on March 17, 2010 and March 31, 2010. After multiple requests, Sedgwick received medical records from Dr. Singh on April 6, 2010. The records included a March 24, 2010 MRI, which revealed a moderate-sized joint effusion, complicated popliteal cyst with findings suggesting recent rupture, tear of the medial posterior horn, extending from the base into the inferior surface, and partial tear of the femoral insertion of the lateral collateral ligament. Dr. Singh had referred Plaintiff to Dr. Senese.

On April 20, 2010, Sedgwick initially approved Plaintiff's claim and provided LTD benefits to Plaintiff beginning on March 11, 2010, (after exhaustion of the LTD Plan's 90-day waiting period). Plaintiff's monthly long-term disability ("LTD") benefit was $1709.75, which was 60% of his Basic Monthly Earnings.

On May 21, 2010 and June 14, 2010, requested medical records from Dr. John Meaney, who it had learned was also treating Plaintiff. After several requests, on July 7, 2010, Dr. Meaney submitted several treatment records. All of Dr. Meaney's progress notes follow the SOAP method of documentation, which is

an acronym for Subjective, Objective, Assessment and Plan. The objective findings documented in Dr. Meaney's progress notes reflect that at Plaintiff's May 21, 2010, Plaintiff presented as a "well-nourished male in no distress." However, in the treatment plan portion of the progress note, Dr. Meaney concluded that Plaintiff had failed conservative treatment and would require a total knee replacement. At the June 10, 2010 visit, Dr. Meaney's objective findings were that Plaintiff had an unchanged examination from the May 21, 2010 appointment. The treatment plan was that Plaintiff would proceed with the knee replacement pending insurance approval. On June 30, 2010, Plaintiff had total knee replacement surgery.

At Plaintiff's July 12, 2010 office visit, Dr. Meaney's objective findings reflected that Plaintiff's staples were removed, and he was Steri-Stripped. No infection or DVT was noted and he was "Neurovascularly intact distally." Dr. Meaney's treatment plan included physical therapy in a pool. Additionally, Plaintiff was to continue an "aggressive exercise program." He was to be rechecked in a month.

At Plaintiff's August 2, 2010 visit, Dr. Meaney's objective findings were: "Wounds healed. No infection, no DVT. Neurovascularly intact distally. Pretty much full extension. Flexion to 115 degrees. Ligaments are stable." Dr. Meaney's documented treatment plan was for Plaintiff to continue strengthening exercises.

He would be rechecked in a month or earlier should the need arise.

On September 15, 2010, Sedgwick requested updated medical records from Dr. Meaney for Plaintiff's September 13, 2010 visit and his physical therapy records from January 1, 2010. On September 28, 2010, Sedgwick still had not received the requested medical records from Dr. Meaney. Consequently, Sedgwick sent correspondence to Plaintiff on September 28, 2010, informing him that it would be forced to deny his LTD claim if records were not received from Dr. Meaney by October 12, 2010. On October 1, 2010, Dr. Meaney submitted more progress notes. Plaintiff's September 13, 2012 progress note reflects the following objective findings: "Wounds healed. No infection, no DVT. Neurovascularly intact distally. Full extension. Flexion to 125. Ligaments are stable." Dr. Meaney's treatment plan for Plaintiff was to continue strengthening exercises and be rechecked in a month.

On October 1, 2010, Sedgwick also received Plaintiff's physical therapy initial evaluation and discharge summary. The physical therapy initial evaluation noted Plaintiff's increased edema, decreased range of motion, decreased strength, and increased pain. The evaluation ordered outpatient physical therapy two to three times a week for six weeks.

The physical therapy discharge summary reflected a treatment period of July 7, 2010 to August 5, 2010, with Plaintiff having completed nine visits. The

summary further reported that Plaintiff had "responded well" and had improved strength, improved range of motion, a decrease in pain, and improved gait. A continued home exercise program was recommended.

On November 22, 2010, Dr. Meaney submitted progress notes from Plaintiff's October 26, 2010 visit, which reflects the following objective findings, "He has full extension, Flexion to 125. Ligaments are stable. Basically still working on his quads. Still gets some puffiness periodically, but it is getting better." In his treatment plan, the doctor noted that he would see Plaintiff in a month or earlier, should the need arise. He further noted, "His preoperative pain is gone. He is trying to work through some surgical discomfort." Dr. Meaney's January 10, 2011 progress notes reflect that subjectively, "He [Plaintiff] is doing fine." Dr. Meaney's objective findings reflect that Plaintiff has, "Full extension. Flexion to 125. No infection, no DVT. Neurovascularly intact distally. Still gets some pain in the knee, but it is slowly getting better." His treatment plan was for Plaintiff to continue strengthening exercises and to maintain work restrictions. Plaintiff was to be rechecked in a month. Dr. Meaney's February 7, 2011 progress notes reflect the following objective findings, "Wounds healed. No infection, no DVT. Neurovascularly intact distally. Full extension. Flexion to about 125. Ligaments are stable." Dr. Meaney's treatment plan was to check Plaintiff in two to three months or earlier should the need arise.

In contrast to his objective findings at the February 7, 2011 appointment and without citing any medical testing, Dr. Meaney wrote a letter dated February 10, 2011 suggesting that Plaintiff perform sedentary work only for 20 hours per week with limitations of "no kneeling, crawling, climbing, stooping, or certainly have any activity around moving machinery or anything of that nature."

Taking into consideration Dr. Meaney's objective findings in his progress notes, Sedgwick concluded that Plaintiff no longer met the definition of Disabled and therefore no longer qualified for benefits under the LTD Plan.

On March 11, 2011, Sedgwick notified Plaintiff that he no longer qualified for LTD benefits. The denial notification letter to Plaintiff explained that Sedgwick fully considered all medical records that it received from Plaintiff's treating physicians to make the determination. In an effort to provide a full and fair evaluation, Sedgwick nurse case manager, Margie Vargo, RN, CCM, CDMS, reviewed the medical documentation. Nurse Vargo determined that there was no objective medical evidence to support his inability to work beyond February 28, 2011. Specifically, Nurse Vargo referenced the objective findings in Dr. Meaney's progress notes. Specifically, the denial letter states:

> You underwent a right knee arthroplasty on 6/30/10. An ex-ray dated 6/30/10 states that the right knee arthroplasty performed was in good position and alignment of bony structures and hardware apparatus was essentially anatomical. Dr. Meaney documented in the 2/7/2011 progress note that you are doing fine. He notes that you have full extension and flexion to 125 degrees. Your ligaments are stable. You are neurovascularly intact distally. Based on the medical

information provided, the Nurse Case Manager stated that there is no documentation of an antalgic gait or need for an assistive device to ambulate. There is no documentation of effusion, tenderness, or redness. There is no documentation of infection or DVT. There is no documentation of objective testing to support your inability to stand, to walk, to carry, to push, to pull, to kneel, or to climb a ladder. There is no existing data indicating that the knee prosthesis would be harmed as a result of kneeling. Your position does require heavy lifting; however it is not done repetitively, it is done occasionally. Based on this information, there is no objective medical to support your inability to work and your claim for benefits is denied beyond 2/28/2011.

Sedgwick also advised Plaintiff of his right to appeal the determination within 180 days, and provided an appeal packet of information.

Prior to proceeding with filing his appeal, Plaintiff's counsel requested a complete copy of Plaintiff's claims file, which was sent to Plaintiff's counsel on June 21, 2011.

Plaintiff submitted a written appeal of the denial of additional LTD benefits on September 12, 2011, five (5) days after the deadline proscribed by the LTD Plan. Although the appeal was technically untimely, Sedgwick still processed Plaintiff's appeal in order to give Plaintiff every opportunity to carry his burden of establishing that he was entitled to receive additional benefits under the LTD Plan.

Plaintiff's appeal consisted solely of a letter from his attorney. Plaintiff did not submit a single medical record or any objective evidence with his appeal. Plaintiff's sole argument in the appeal letter for overturning the denial was that Sedgwick had allegedly failed to speak with Plaintiff's orthopedic surgeon before denying additional benefits. In addition, the appeal letter purports to quote a

statement by Dr. Meaney allegedly made on March 31, 2011; however, no medical record or progress report dated March 31, 2011 by Dr. Meaney was ever submitted to Sedgwick either during its initial review or during the appeal review. After receiving Plaintiff's appeal letter, Sedgwick reviewed the file and summarized the history of the claim and the medical that was contained in the file.

Sedgwick then contacted Plaintiff's counsel to determine whether Plaintiff intended to submit any medical records or other information in support of the appeal. Sedgwick left a message for Plaintiff's counsel on September 19, 2011 and then subsequently spoke with Pam from Plaintiff's counsel's office to explain the medical in the file and ask whether additional information would be submitted. Pam from Plaintiff's counsel's office advised Sedgwick that she would check to see if additional information would be provided. As no follow-up call was received, Sedgwick followed up on September 28, 2011. On September 30, 2011, Pam from Plaintiff's counsel's office informed Sedgwick Plaintiff had no additional information to submit.

Sedgwick then referred Plaintiff's appeal and the complete claims file to Network Medical Review, Co., which remitted Plaintiff's medical records to Dr. Victor M. Parisien, M.D., a Board Certified Orthopaedic Surgeon, for review. On October 7, 2011, Dr. Parisien issued findings based on his review of the medical records, Plaintiff's job description, and the claims file. Dr. Parisien

attempted to contact Dr. Senese and Dr. Meaney, but was unable to reach them despite leaving two separate messages for each physician. Dr. Parisien spoke to Dr. Singh, who reported that he did not evaluate Plaintiff for any other condition besides sinusitis, cough, or breathing problems and had no opinion on his disability. Based on his review of the claims file, Dr. Parisien concluded that Plaintiff was not Disabled as of March 1, 2011. He further opined that there was no clinical indication in the medical notes substantiating a finding that the patient could not do his regular unrestricted work as of March 1, 2011. Specifically, Dr. Parisien's report reflects the following:

> **ORTHOPEDIC SYNOPSIS**: Mr. Plaintiff . . . works as a stationary engineer. This job requires him to lift occasionally 50 to 75 pounds, to carry 50 pounds occasionally for 50 feet, to use stepladders occasionally to frequently, to kneel occasionally, and to crouch occasionally.
> . . .
>
> 1. Is the employee disabled from the ability to perform his regular unrestricted occupation as of 3/1/11?
>
> The employee is not disabled form the ability to perform his regular unrestricted occupation as of 3/01/11. There is no clinical indication in the medical notes provided that the patient could not do his regular unrestricted work as of 03/01/11. The examination on 10/26/10 noted he had 0 to 125 degrees of flexion of his knee. Examination was unchanged on 01/10/
>
> **RATIONALE:** This patient underwent a total knee replacement on 06/30/10. He did well postoperatively and as of 10/28/10 he had recovered a flexion of 125 degrees and had full extension. Examinations were unchanged on 01/10/11 and 02/07/11. He was given a note on 02/10/11 for no kneeling, crawling, climbing or

- 14 -

stooping. There is no clinical information provided to support these restrictions. There is no indication that he had any complications that would prevent him from returning to full duty work. As of 03/01/11 he was approximately nine months post total knee replacement and by this time would have recovered sufficiently to enable him to return to his regular occupation. There is no indication in the clinical record that any complications have occurred or that he could not do his regular job to include kneeling and climbing stepladders and carrying 50-pound weights with occasional lifting of 50-75 pounds. No clinical information has been provided to support inability to perform these tasks. The employee is not disabled from the ability to perform his regular unrestricted occupation as of 03/01/11.

On October 14, 2011, Sedgwick notified Plaintiff that based upon the medical file review and the independent review of Dr. Parisien, Sedgwick had determined that Plaintiff was not eligible for additional LTD benefits as of March 1, 2011 because he did not meet the LTD Plan's definition of Disabled, and denied his appeal.

On November 28, 2011, Plaintiff's counsel sent a letter requesting a complete copy of Plaintiff's claim file. Sedgwick provided the complete copy of the claims file on December 29, 2011.

On January 27, 2012, after Plaintiff's right to an appeal was exhausted and the administrative record was closed in this matter, Plaintiff attempted to submit additional information to Sedgwick and asked Sedgwick to reconsider its decision to deny benefits. Sedgwick responded by letter dated February 29, 2012, informing Plaintiff that the appeal determination dated January 27, 2012 was final

and the claim would not be reopened.

Plaintiff filed this lawsuit on August 16, 2012.

## Discussion

### Standard of Review

In *Metropolitan Life Insurance Co. v. Glenn,* 128 S.Ct. 2343, 2347-48 (2008), the Supreme Court acknowledged that in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111-13 (1998), the Court set out four principles as to the appropriate standard of judicial review under ERISA, § 1132(a)(1)(B), as follows: (1) A court should be "guided by principles of trust law," analogizing a plan administrator to a trustee and considering a benefit determination a fiduciary act, *id.,* at 111-113, 109 S.Ct. 948; (2) trust law principles require de novo review unless a benefits plan provides otherwise, *id.,* at 115, 109 S.Ct. 948; (3) where the plan so provides, by granting "the administrator or fiduciary discretionary authority to determine eligibility," "a deferential standard of review [is] appropriate," *id.,* at 111, 115, 109 S.Ct. 948; and (4) if the administrator or fiduciary having discretion "is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion,' " *id.,* at 115, 109 S.Ct. 948. There is no dispute that the plan gives Defendant the discretionary authority to determine Plaintiff's eligibility for long-

term disability benefits. Thus the standard of review in this matter is for an abuse of discretion, thus, only if the Defendant's decision was arbitrary and capricious will the decision be overturned. *Id.*

Plaintiff argues that Defendant abused its discretion in failing to give a full and fair review of Plaintiff's claim. Initially, it should be noted that Plaintiff attempts to modify the administrative record by quoting Dr. Meaney's March 31, 2011 opinion, which was not included in the claims file. Plaintiff argues that the determination of his treating physician was not given the proper consideration. However, a plan administrator is not required to give more deference to a treating physician's opinion over the reviewing doctor's opinion. *Weidner v. Federal Express Corp.*, 492 F.3d 925, 930 (8th Cir. 2007); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *Cagle v. Unum Life Ins. Co. of America*, 2009 WL 995544 (E.D. Mo. 2009).

The record establishes that Defendant considered all of the evidence presented in support of Plaintiff's claim. It is undisputed that Dr. Meaney noted that Plaintiff was improving after his surgery, that an aggressive exercise program was prescribed and that his extension and flexion were increasing.

Although Dr. Meaney did write a note dated February 10, 2011 suggesting that Plaintiff perform sedentary work for only 20 hours per week, with the

limitations of "no kneeling, crawling, climbing, stooping, or certainly have any activity around moving machinery or anything of that nature," Dr. Meaney did not support these limitations with any medical documentation or evidence.

Defendant's hired consultant, Dr. Parisien, reviewed Plaintiff's medical records and attempted to consult with Plaintiff's treating physicians. They were unresponsive. Dr. Parisien determined that Plaintiff was not disabled from his job.

Under an abuse of discretion standard, the decision of the Plan Administrator will not be disturbed if it is "reasonable." Reasonableness is measured by whether substantial evidence exists to support the conclusion. *Wakkinen v. Unum Life Insurance Co. of America*, 531 F.3d 575, 583 (8th Cir. 2008).

The Administrative Record clearly shows that Defendants considered all of the medical evidence and opinions offered by Plaintiff and by its consulting physicians.

Finally, Plaintiff attempts to create an issue with regard to the inherent conflict by citing *Manning v. American Republic Insurance Company*, 604 F.3d 1030 (8th Cir. 2010). *Manning*, however, is inapposite. The record clearly establishes that the instant case involves a self-funded LTD Plan. As the Plan reflects, benefits are paid by the Ascension Health Welfare Benefits Trust; claims

determinations are made by Sedgwick. There can, therefore, be no inherent conflict of interest as the payor of benefits does not make the determination of disability.

## Conclusions of Law

Based upon the foregoing analysis, the Court concludes the following conclusions of law:

Defendant's decision to deny Plaintiff's claim for long term disability under the Plan was not an abuse its discretion.

The decision to deny Plaintiff's claim for long term disability benefits under the Plan at issue was reasonable.

Because Defendant's denial of Plaintiff's claim was not an abuse of discretion, the decision is affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, [Doc. No. 57], is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment, [Doc. No. 54], is **DENIED**.

**IT IS FURTHER ORDERED** that the decision of Defendant to deny Plaintiff's claim for long term disability benefits under the Plan herein is affirmed.

A separate judgment in accordance with this Opinion, Memorandum and Order is entered this same date.

Dated this 6th day of February, 2014.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE